UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAN RATH,

             Petitioner,

v.                                                Case No. 8:16-cv-2016-T-23AEP

VERONIKA MARCOSKI,

             Respondent.

_____/

## **REPORT AND RECOMMENDATION**

THIS MATTER is before the court on referral by the Honorable Steven D. Merryday for a Report and Recommendation on Petitioner's Amended Petition to Recognize Foreign Judgment and Order Compliance and Return of Child (the "Petition") (Dkt. No. 14) and Emergency Motion to Return Child to Home Jurisdiction (Dkt. No. 3). The Respondent has filed an Answer (Dkt. No. 15) and an Opposition to Petitioner's Emergency Motion (Dkt. No. 16). Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), which is embodied in the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011 (formerly cited as 42 U.S.C. §§ 11601-11610), Petitioner seeks an order directing a prompt return of his minor child, L.N.R., to the Czech Republic, and also seeks an award of the fees and costs incurred in connection with the Petition.[1]

An evidentiary hearing on the matter was conducted August 15, 2016 through August 18, 2016,

---

[1] Petitioner also sought relief in the Petition pursuant to Florida Statutes, Chapter 61, however, Petitioner has since abandoned that claim. Thus, the only matter before the Court is Petitioner's request pursuant to the Hague Convention.

and August 29, 2016 through August 31, 2016.[2]  After careful consideration of the record, the undersigned recommends that the Petition (Dkt. No. 14) be granted, and the Court direct that L.N.R. be promptly returned to the Czech Republic.

## I.  Factual Findings

Petitioner, Jan Rath ("Petitioner"), is a citizen of the Czech Republic and has resided in the Czech Republic his entire life, except when he was an exchange student in the United States in 1995 through 1996, and worked in the United States as a student in 2010.  The Petitioner is a lawyer in the Czech Republic, where he and a law partner have a firm in Prague.  Petitioner's parents also reside in Prague, but Petitioner's sister and niece reside in Australia.  Respondent, Veronika Marcoski ("Respondent"), was born in the Czech Republic, and resided there until age fourteen.  Currently, Respondent's brother and maternal grandparents, who are citizens of the Czech Republic, reside in the Czech Republic.  Respondent, at age fourteen, along with her mother and brother, moved to 15845 Redington Drive, Redington Beach, Florida (hereinafter "Redington Beach residence").[3]  *See* R#5 (depicting photograph of residence).   Respondent became a United States citizen in 2000, and is a dual citizen of the United States and the Czech Republic.  Respondent attended high school in Pinellas County, graduated in 2005 from Rollins College in Orlando, and in 2009 completed law school at the University of Miami, in Miami, Florida.  Respondent passed the Florida Bar exam in 2010, and was later admitted to the Florida Bar in 2012.

---

[2] As discussed below, during the evidentiary hearing the Respondent orally moved for dismissal of the Petition (Dkt. No. 14) based upon allegedly deceptive litigation tactics.

[3]  In 2008, Respondent acquired ownership of the Redington Beach residence by a warranty deed transfer.  *See* R#4.

In 2010, Respondent was unfortunately diagnosed with non-Hodgkin's lymphoma, which required surgery. Respondent opted to have her surgery done by doctors in the Czech Republic. The surgery was performed in September 2010, and it was during this time period in 2010 that Petitioner and Respondent met for the first time. Petitioner sought out Respondent's mother, Lenka Malkova ("Malkova"), to facilitate a business deal between Petitioner's client and Malkova. Malkova owned a building in Prague through her company V.D. Kuka. *See* P#54 (detailing corporate records of V.D. Kuka and listing Respondent as a member of the Board of Directors).[4] Petitioner's client was seeking to rent space in the building to operate a night club. The deal was facilitated through a separate company, Slamaris, S.R.O., of which Respondent was a minimal shareholder, holding at one point approximately five percent of the shares. When the business deal was concluding in approximately June 2011, Petitioner and Respondent's relationship began to evolve from business dealings to romantic dating. In August 2011, they traveled together for approximately two weeks to Australia, *see* P#65, and, in approximately October 2011, Petitioner took Respondent on a surprise trip to Italy. Over the course of their relationship, Petitioner and Respondent traveled to various other places, including Portugal, multiple trips to the Bahamas, and trips to the United States, including Florida and Colorado.

Although Respondent passed the Florida Bar exam in 2012, she decided to focus on her health rather than begin her legal career, so Respondent began spending time in other locales outside of the United States, specifically including spending significant time in the Czech Republic. In 2012, Respondent became the Executive Director of Radiopalac spol. s.r.o.

---

[4] Although P#54 was translated into English, a majority of the documents admitted into evidence were not translated, so the Court's findings regarding those documents are based solely upon the translations made by witnesses during testimony.

("Radiopalac") (*see* P#52), which was a company formed to rent out a ballroom for events in a property owned by Respondent's mother.[5]  Beginning some time in 2012, Respondent's mother became involved in a property dispute over a neighbor's construction project on an adjacent property in a historic neighborhood in Prague.  To assist her mother in the property dispute, Respondent wrote multiple letters to Prague government officials (*see* P#86), and attended numerous Prague municipality meetings (*see* P#51) to contest the neighbor's construction project.  Although more meetings occurred, Respondent recalled attending at least six of the municipality meetings, including meetings in November 2012, and in January, March, April, May, and June of 2013.  Also in 2013, Petitioner and Respondent discussed purchasing or investing in properties in the Czech Republic, such as a gas station or a rooftop construction project over Petitioner's parent's condo building.  *See*, *e.g.*, R#18.

In November 2013, Petitioner purchased an engagement ring for Respondent.  *See* P#45 & 67.  The following month, Petitioner and Respondent traveled to Colorado to spend Christmas with Respondent's family in Colorado.  Soon after this Christmas trip, in January 2014, Petitioner presented the engagement ring to Respondent.  Respondent accepted the ring. *See*, *e.g.*, P#11.  Around February 2014, Petitioner located a residence for sale at 853 Zdenka Nyplova Street, Prague 16, Zbraslav District ("Zbraslav residence").  In April 2014, Petitioner and Respondent jointly purchased the Zbraslav residence with a right of first refusal in the event either wanted to sell their ownership share.  The mortgage on the property was executed in Petitioner's name (*see* P#14), and a bank account was established to make the mortgage payments.  Petitioner and Respondent were responsible for an equal share of the mortgage and

---

[5] Respondent was the owner of Radiopalac through April 2016, but ownership of the company has been recently transferred to Respondent's mother.

payments were jointly made on the mortgage from August 2014 until March 2016. *See* P#17. Although the Zbraslav residence was livable when purchased by Petitioner and Respondent, they hired workers to do a variety of improvements to the home. *See* P#70 &71 (reflecting plans and payments drawn from the joint mortgage account for the re-construction).[6] Around July 2014, Adam Krupp, an individual who Petitioner befriended during his time in the United States as a student, visited Petitioner and Respondent in the Czech Republic. Approximately one month later, in August 2014, Petitioner and Respondent took a trip together to visit the Bahamas. Later that same month, on August 30, 2014, Respondent registered papers with the Municipal Court in Prague to form a charitable foundation called Radiopalac Foundation. *See* P#53 (stating that the purpose of the foundation is publicly beneficial and charitable). After the Bahamas trip, Respondent returned to Florida. In September 2014, Respondent, her mother, and a friend had plans to travel in Europe and in the Czech Republic. During this trip, Respondent's mother, Malkova, experienced health issues, originally believed to be back problems. Malkova chose to seek treatment for her health problems in the Czech Republic. Around the same time, in October 2014, Petitioner and Respondent conceived L.N.R. Later, in and around November 2014, Malkova was unfortunately diagnosed with ovarian cancer. To treat the disease, under the care of doctors in the Czech Republic, Malkova had two surgeries in January 2015, and received chemotherapy treatments from February through June of 2015.

On January 22, 2015, Respondent communicated with friends in the United States soliciting opinions on OBGYN doctors in Miami, Florida. *See* R#25. On that very same date, Petitioner's father confirmed that he was able to register Respondent for childbirth at a hospital

---

[6] *See also* P#94 and R#20 (presenting various photographs of the Zbraslav residence and property).

in the Czech Republic.  *See* P#4.  Two days later, on January 24, 2015, Respondent completed on-line a Maternity Pre-Registration Form for Baptist Hospital in South Florida.  *See* P#24.  On May 11, 2016, Petitioner canceled his cable subscription at his apartment, Sevcikova 5, Prague 3, and a few days later on May 16, 2015, he opened up a cable subscription for Respondent's apartment at Maltezske, Prague 1.  *See* P#16 & 17.   From June through December 2015, Petitioner purchased household items for himself, Respondent, and L.N.R.  *See* P#4 (identifying purchases made at Makro, a wholesale store, of which Petitioner was a member); *see also* P#57 (displaying shopping list of items from Respondent to Petitioner); P#58 (invoicing a December 2015 purchase of a breast pump by Petitioner).  In and around May 2015, Respondent was advised not to travel during her pregnancy.[7]  On May 1, 2015, Respondent sent a letter to her tenants at the Redington Beach residence informing them when they would need to leave the residence so she could "arrive from Europe and give birth to my baby."  R#26 (noting further that Respondent was "due to give birth in the end of July and would like to move in the house thereafter").[8]

On July 14, 2015, L.N.R. was born.  *See* P#1.  As part of her birth plan, Respondent memorialized that she wanted Petitioner present for the birth, *see* P#78, and Petitioner was

---

[7] Admitted into evidence are the following records: R#29 (a hearsay statement from Respondent's doctor indicating that she advised Respondent not to travel to the United States in May 2015); R#19 (a hearsay statement made by the contractor for the Zbraslav residence claiming that he was advised that the property was an investment); R#36 (a hearsay statement made by Respondent's accountant about advice he gave Respondent regarding her eligibility for a parental allowance in the Czech Republic); P#19 (a hearsay statement by L.N.R.'s pediatrician stating that Petitioner was present during the doctor's appointments).  Although I admitted these records into evidence, I give little to no weight to the records given that the statements in the records are clearly hearsay.

[8] Respondent had the Redington Beach residence utilities put back in her name in August 2015.  R#27.

present for L.N.R.'s birth. *See* P#69. On September 16, 2015, Petitioner and Respondent submitted paperwork to give L.N.R. Petitioner's last name. *See* P#2.[9] On that same date, September 16, 2015, L.N.R. had a doctor's appointment, during which L.N.R. was diagnosed with bilateral hydrocele. *See* R#33. L.N.R. had routine visits with the doctor occurring on October 15, 2015; November 11, 2015; and January 22, 2016, which was L.N.R.'s last doctor's visit in the Czech Republic. *See id.* In October, the presence of hydrocele is noted in L.N.R's medical records; in November, hydrocele is noted again, with a reference noting, "scrotal hernia?" thereby indicating a possibility that L.N.R. may have a scrotal hernia; and in January, the medical record reflected hydrocele again, but further noted that "surgery: the finding is about to reduce . . . ." *Id.* Further, the medical records noted that, in September, the "Parents are still indecisive about vaccination; in November, that "Parents yet refuse vaccination[;]" and in January that "child not yet vaccinated, the mother wants to delay vaccination. Must be provided written disapproval with the compulsory vaccination." *Id.*

On that same date, September 16, 2015, at Respondent's request,[10] Petitioner signed a Declaration of Intent, which stated:

> I, Jan Rath . . . , believe it is in the best interest of my son [L.N.R.] . . . to be a citizen of the United States, to grow up experiencing American culture and knowing the English language.
>
> I hereby certify this document is intended as a formal declaration of my belief in the above and my intent to do all that is in my power to facilitate the above and not hinder in any way what is in the best interest of my son.

---

[9] To help facilitate the name change, Respondent needed to formally have her name changed in the Czech Republic, and did change her name to Marcoski on August 10, 2016. *See* P#64.

[10] The Declaration of Intent was sent on September 16, 2015 from Respondent to Petitioner. *See* P#92.

P#92 and R#39.  Approximately two weeks after executing the Declaration of Intent, on September 30, 2015, Petitioner and Respondent went to the United States Embassy to obtain a Consular Report of Birth Abroad, *see* R#40, and a United States Passport for L.N.R.  *See* R#41. Also in September 2016, Petitioner, intending to transfer to Respondent his ownership share of the Zbraslav residence, drafted and delivered a gift deed to Respondent's grandfather, but later withdrew the gift deed in writing on September 21, 2016.  *See* P#65 at Ex. 4.  In November and December of 2015, Petitioner and Respondent made payments for the construction work being done at the Zbraslav residence.  *See* P#70 &71.

For their first Christmas with L.N.R., Petitioner and Respondent first enjoyed the holiday with Respondent's family in a cottage in the mountains, which cottage is owned by Respondent.  *See* P#91 (containing several photographs of Petitioner, Respondent and L.N.R. with Respondent's family at the cottage).  Respondent drove separately to the cottage and arrived at the cottage a few days before Petitioner.  Respondent sent Petitioner, on December 22 and 23, 2015, a number of text messages asking Petitioner to do a variety of things before he arrived at the cottage.  *See* P#100.  In the text messages, Respondent referred to Petitioner as "Honey" or "My Love," and would end some of the messages by saying, "I love you" or "we miss you here."  *Id.*  In the text messages, Respondent requested that Petitioner do some "things at home" before leaving for the cottage, including putting sheets in the dryer at the house so he could bring them dry to the cottage; finding and bringing L.N.R.'s spoon to the cottage; and bringing a bag with gifts.  *Id.*  Respondent further requested that Petitioner pick up a package for her grandfather, pick up a picture frame, and go grocery shopping for a number of items to be purchased at Makro for the dinner to be served at the cottage.  *Id.*  The picture frame Respondent asked Petitioner to pick up was a frame used for a gift Respondent gave Petitioner

for Christmas, which was Respondent's hand print in red paint over Petitioner's hand print in black paint, and L.N.R.'s hand print in blue paint over both his parents' hand prints.  *See* P#90. Respondent also specifically asked Petitioner to print out the plans for the Zbraslav residence and bring them with him to the cottage.  *See* P#100.  After spending time at Respondent's cottage with her family, Petitioner and Respondent then drove to the home of Petitioner's parents to spend time over the Christmas holiday and to celebrate Petitioner's birthday with Petitioner's family.  Respondent's grandfather sent Petitioner a text message on December 28, 2015, wishing Petitioner a happy birthday.  *See* P#73.

On January 24, 2016, in response to an inquiry by Petitioner's mother, asking if Respondent needed her to babysit for L.N.R., Respondent sent a text message to Petitioner's mother stating:

> [h]ello Jitka, I am very sad of it, you certainly know that Honza[11]
> split up with me and it is very hard for me I plan to be outside of
> Prague with [L.N.R.] on Tuesday, so no.  Thank you

P#80.  Around the end of January 2016, Petitioner calculated child support payments in the amount of approximately $800 per month, and began making such payments from January to April 2016.[12]  *See* P#21.  From January 2016 until April 2016, Petitioner would see L.N.R. two or three times per week,[13] but his visitations with L.N.R. were not based upon a regular schedule.  Rather, Petitioner and Respondent would communicate, often by text messages, to

---

[11] Honza is a nickname for Petitioner.

[12] After April 2016, when Respondent left the Czech Republic with L.N.R., Petitioner set up a different bank account and continued depositing child support payments.

[13] *See e.g.* P#10 (composite exhibit of photographs picturing Petitioner and L.N.R.).

set up meeting times and locations. *See* P#23 (displaying text message communications between Petitioner and Respondent from January 18, 2016 through April 18, 2016).

For example on January 18, Respondent asked Petitioner if he could take L.N.R. on the upcoming Friday, and Petitioner responded, yes, and asked Respondent to send a photo of L.N.R., to which Respondent sent a photo of L.N.R. *Id.* Throughout the text message communications Petitioner regularly requested Respondent for visitations with L.N.R.: on January 25, 2016, he asked about babysitting; on February 5, 2016, he asked to see L.N.R; on February 9, 2016, he asked to see L.N.R. before Respondent took him to the cottage; on February 15, 2016, he asked to see L.N.R. and also asked, on that same date, if his parents could see L.N.R.; on February 22, 2016, he asked to babysit L.N.R.; on March 7, 2016, he asked to see L.N.R; on March 11, 2016, he asked to see L.N.R.; on March 13, 2016, he asked what time could he see L.N.R.; on March 15, 2016, he asked if he can have L.N.R. overnight and to do so at least once a week; on March 18, 2016, he asked what time he could see L.N.R.; on March 29, 2016, he asked when he could see L.N.R.; on March 30, 2016, he asked if he could see L.N.R. the next day;[14] and on April 7, 2016, he asked what time could he babysit L.N.R. *Id.*

In February 2016, Petitioner sold his equal share of the Zbraslav residence to Respondent. Beginning in March 2016, Marcela Mikesova ("Mikesova") was hired by Respondent to babysit for L.N.R. Mikesova watched L.N.R. approximately eight times and last saw L.N.R and Respondent on April 18, 2016. On April 10, 2016, in response to an offer to watch L.N.R. from Petitioner's mother, Respondent sent Petitioner's mother a text message stating:

---

[14] On April 1, 2016, Respondent replied to this request by stating that L.N.R. was sick and sent a picture of L.N.R. On April 2, 2016, Petitioner asked how L.N.R. was feeling. P#23.

> Hello Jitka, thank you for offering me help, the whole week had been so chaotic-[L.N.R.] was weak due to flu so I could not plan much.  This week I am at the cottage at least till Wednesday (and if work allows, then till Sunday) so [L.N.R.] will enjoy mountain air (and Masenka).  He has recovered here already.  Have a nice Sunday, see you V.

P#80 at 1229.  On that same date, Petitioner drove to Respondent's cottage to see L.N.R., which was the last time Petitioner saw L.N.R. in the Czech Republic.  On April 12, 2016, Respondent sent an e-mail to Petitioner stating, in sum, that, after discussing the matter during a phone conversation, she was shocked to learn that Petitioner had failed to file the appropriate paperwork to remove his right of first refusal from the Zbraslav residence, since it was agreed that it would be terminated by her February purchase of his share of the residence.  *See* P#22.  On April 13, 2016, Petitioner responded to Respondent by e-mail stating that, amongst other things, he would take care of deleting the right of first refusal, but that he was shocked that she was threatening not to let him see L.N.R. if he did not remove the right of first refusal from the Zbraslav residence.  *Id.*  On April 14, 2016, Respondent replied to Petitioner by e-mail and stated that, as Petitioner knew, she was in the mountains with L.N.R. without a computer and that she was happy he would resolve the right of first refusal issue, but that he should not bring L.N.R. into the issue.  *Id.*  On April 15, 2016, Petitioner sent Respondent another e-mail, stating, in sum, that he wanted to make a formal agreement on when and where he could see L.N.R., including visitations over the holidays, and that, if they could not come to an agreement amongst themselves, he suggested using the services of a court-authorized mediator.  *Id.*  The next communication is a text message in which Petitioner, on April 17, 2016, in essence, asked Respondent whether she was fulfilling a prior threat to him by not letting him see L.N.R.  *See* P#23.  Respondent responded to Petitioner by text message on April 18, 2016, and stated that she had been trying to call Petitioner; she questioned what Petitioner was writing and what

threat he was talking about; she noted that Petitioner didn't call during the week and now quickly-quickly before the departure; she further commented that she didn't understand his games, that they agreed to something, and that L.N.R.'s and her travel and life plans were not going to change according to Petitioner's mother; and she ended the message by asking "[d]o you want to see L.N.R. before departure."  *See* R#55.

On April 18, 2016, Petitioner flew to Liverpool, England and then drove to Manchester, England, to meet with a client in advance of a court appearance in Manchester on the following day.  *See* P#26 (court notice for hearing on April 19, 2016, in Manchester).  Also on April 18, 2016, Respondent filed a lawsuit in the Czech Republic against Petitioner to quiet his right of first refusal on the Zbraslav residence.  *See* P#75 (noting that Respondent was residing at Eversfield Court in the United Kingdom).  On April 19, 2016, Malkova purchased plane tickets for Respondent, L.N.R., and herself to fly from Munich to London, on that same date, and then from London to Miami on April 21, 2016.[15]  On that same date, Respondent sent Petitioner a text message stating, in essence, that on April 18, 2016, she unsuccessfully attempted to call Petitioner nine times but that he hung up on her; that the excitement of London was probably a big temptation to prevent Petitioner from saying goodbye to L.N.R. prior to departure; that Petitioner knew of her life situation and that the relationship with his family would be distant; that she is tired of packing and traveling with L.N.R.; and that she does not want to argue over text messages.  *See* R#55.  On April 21, 2016, Petitioner sent Respondent two e-mails.  The first e-mail, sent at 5:18 p.m., in part, stated:

---

[15] Notably, no records regarding the April 2016 flights were admitted into evidence. However, Malkova testified that she bought the plane tickets on a Tuesday but could not recall if that was April 18 or 19, 2016.  The Court takes notice that Tuesday was April 19, 2016.

> Could you please tell me why you are not allowing me to see [L.N.R.] for almost a second week?  I am not even mentioning his grandparents (my parents), they are completely weaned.  Is that because I was from Monday to Wednesday on a business trip to England or what?  The motion to the land register has been filed last week already, so I did what you wanted.  Where is the problem now?

P #99.  In the second e-mail, sent at 5:30 p.m., Petitioner stated that he was sending Respondent the documentation she requested him to sign and that he was going to take care of everything else regarding the issue surrounding the right of first refusal on the Zbraslav residence, and then asked Respondent "[c]an I see [L.N.R.] already?"  *Id.*  On April 22, 2016, Petitioner was contacted in an e-mail by Julie Young, a friend of Respondent, advising Petitioner that she was Respondent's and L.N.R.'s attorney, and that all communication to Respondent regarding any issues should be directed to Ms. Young.  *See* P#44.  Subsequently on April 28, 2016, Respondent filed in Pinellas County a law suit against Petitioner to determine parental responsibility, time-sharing, and child support pursuant to the laws of Florida.  *See* P#6 & 93 at 2 ¶ 7 (alleging that up to the filing of the suit Petitioner has not been involved in the life of the child).

Against the backdrop of the above factual findings, Petitioner and Respondent presented clearly divergent characterizations about the nature of their relationship.  Petitioner described the evolution of a loving, committed, and exclusive relationship, resulting in cohabitation through L.N.R.'s birth to the end of the relationship in January 2016.  In stark contrast, Respondent portrayed a romantic relationship that was casual, at best, that was certainly not very serious, nor ever included cohabitation, and that was over by August 2014.

In essence, Petitioner described the evolution of his relationship with Respondent as follows: he met Respondent in 2010 when he was attempting to facilitate a deal with his client

13

and Malkova; in 2011, he began dating Respondent romantically and eventually exclusively; at some point in 2012, Respondent began living with him at his Sevcikova apartment; in January 2014, he proposed to Respondent, and, although Respondent was uncertain about marriage and no date was ever set for the wedding, Respondent accepted the engagement ring; in April 2014, Petitioner and Respondent purchased the Zbraslav home, intending to move into the home after renovations were completed; after returning from a trip to the Bahamas sometime in September 2014, he and Respondent had a short-lived break (approximately two weeks) in their relationship; L.N.R. was conceived in October 2014; after L.N.R.'s birth in July 2015, he and Respondent moved from his Sevcikova apartment into Respondent's Maltezske apartment because it was bigger place; and Petitioner, Respondent, and L.N.R. all lived together as a family until he ended the relationship with Respondent in January 2016.

In contradiction, Respondent, in essence, described her relationship with Petitioner as follows: she met the Petitioner in 2010 when he was attempting to facilitate what she described as a horrible business deal for her mother; her relationship with Petitioner was mainly business-related and that Petitioner would often propose to her various business opportunities; she dated Petitioner, but it was never exclusive, and, in fact, she dated other men, and Petitioner dated other women; she never lived with Petitioner, and, in 2012, through approximately September 2014, she lived primarily in the United States; she never was engaged to Petitioner, and the ring was only a gift; although she purchased the Zbraslav home with Petitioner in April 2014, the home was not for them to move into but rather was an investment property; in August 2014, during a trip to the Bahamas with Petitioner, she ended her casual dating relationship with Petitioner; in September 2014, her plans to travel in Europe with her mother and a friend were derailed by her mother's illness, and, when dealing with the stress of her mother's illness, she

sought comfort from Petitioner in October 2014, which is when L.N.R. was unexpectedly conceived; during her pregnancy she did not live with Petitioner and made it clear that she intended to give birth to L.N.R. in the United States and live with L.N.R. in the United States; and her stay in the Czech Republic had nothing to do with Petitioner but was rather prolonged by other circumstances, namely her mother's cancer and subsequent treatment, her inability to travel as a high-risk pregnancy, and the inability to travel after L.N.R.'s birth because of L.N.R.'s hydrocele.

Petitioner and Respondent's individual depictions about the nature of their relationship were echoed by their respective witnesses. Just a small sample of the witnesses' testimony is illustrative of this point. For example, to corroborate Petitioner's view of the relationship, Petitioner's mother, Jitka Rathova, testified that Petitioner and Respondent lived together after L.N.R.'s birth at Respondent's Maltezske apartment; Adam Krupp, Petitioner's friend from the United States, stated that Petitioner and Respondent had discussed with him in July 2014 their mutual intent to live together at the Zbraslav residence; and Dagmar Pecinova, Petitioner's law partner's girlfriend, explained that she knew Respondent as Petitioner's girlfriend. While, in response, to bolster Respondent's view of the relationship, Respondent's mother, Malkova, testified that Petitioner and Respondent were nothing serious, but rather were simply "friends with benefits;" Ladislav Sedivy, Respondent's grandfather, stated that Respondent lived with him after L.N.R.'s birth and that the relationship with Petitioner was nothing more than a fling on the side; Thea Nicoladeis, Respondent's close friend, testified that Petitioner and Respondent broke off their relationship in August 2014; and Ladislav Barta, a friend of Malkova, and Thomas Fratone, Malkova's ex-husband, both indicated in some fashion that it was their understanding that Respondent intended to be a single mother in the United States.

Given the record before the Court, consisting of obviously differing representations about the nature of the relationship between Petitioner and Respondent, the Court must make credibility assessments to determine the true nature of the relationship.   After careful consideration, and having had the opportunity to observe the demeanor of the witnesses and parties, I find Petitioner credible and Respondent not credible.  Most significantly, I find that Petitioner and Respondent's relationship evolved into a committed and loving relationship (*i.e.*, not a casual relationship) in which Petitioner and Respondent eventually cohabitated, conceived L.N.R., and planned for a future in the Czech Republic with L.N.R.  Certainly, their relationship was not without issues and setbacks, and it unfortunately ended in bitterness and sorrow, resulting in the instant dispute, but, most relevant to the issues at hand, I find that, after L.N.R.'s birth in July 2015 through January 2016, Petitioner and Respondent were in a committed relationship with a shared intent for the foreseeable future to live with L.N.R in the Czech Republic.

In particular, I make these findings in consideration of the documentary and other independent evidence, as detailed above, which overwhelmingly corroborates Petitioner's presentation and dispels Respondent's position about the nature of their relationship.  Initially, I conclude that, as Petitioner claimed, Respondent resided[16] at times in the Czech Republic from 2012 through August 2014.[17]  A fact that could be insightful about an individual's residence is

---

[16] To be clear, I am not finding that Respondent resided only in the Czech Republic.  Rather, given Respondent's significant ties to the United States, it must be accepted that she often would spend time in the United States.  However, I do find that as Respondent's relationship evolved with Petitioner, she spent substantially more time in the Czech Republic than in any other locale.

[17] This time period is significant because it provides necessary context about Petitioner and Respondent's relationship prior to when Respondent claimed she traveled from the United States in September 2014 for a vacation in Europe with her mother and friend.  Respondent

the location of an individual's employment.  However, Respondent, in 2010, delayed her pursuit of the practice of law given her unfortunate diagnosis of non-Hodgkin's lymphoma.  Thus, during the relevant time period, Respondent did not have any employment connecting her to a residence.  Respondent pursued investment opportunities in the Bahamas by purchasing three properties for development and, thus, would often travel to the Bahamas, but Respondent never asserted that she took up residence in the Bahamas.

Examining other facts beyond employment, it becomes obvious that Respondent had significant ties in both the United States and the Czech Republic.  Most notably, Respondent is a citizen of both countries and owns property in both countries.  In the United States, Respondent owned the Redington Beach residence and would often use her mother's Miami apartment.  Additionally, Respondent maintained in the United States her health insurance (R#6); a bank account (R#2); a Florida driver's license (R#1); and, from 2010 through 2013, filed United States tax returns (P#17).  Further, Respondent kept a car parked at the Miami apartment and received her mail at the apartment.  In the Czech Republic, Respondent owned a cottage, a business (*see* P#52) and a foundation (*see* P#53).  Further, Respondent had a Czech Republic identification card (P#62) and significant family ties in the Czech Republic, as her grandparents and brother resided there, and her mother owned multiple business and residential properties there, as well.  None of these additional facts establishes whether Respondent *primarily* resided in the United States or the Czech Republic, but these facts demonstrate that Respondent resided, at times, in both the United States and the Czech Republic, which is more representative of Respondent's intended relaxed lifestyle after her surgery in the Czech

---

does not dispute that she resided in the Czech Republic staring in approximately September 2014 through April 2016.

Republic for her cancer in 2010.  Respondent denied ever residing in the Czech Republic during the relevant time period from 2012 through August 2014, and adamantly denied ever cohabitating with Petitioner, as he claimed.  *See e.g.* R#58, Ex. A at 2 (echoing Respondent's testimony in her Affidavit by stating that "[d]ue to my condition and my concern about the amount of stress my work had been causing me, I devoted more time to my own business than to the practice of law and began to live a more relaxed lifestyle. I continued to live in Miami.") I find Respondent's assertions that she did not reside in the Czech Republic not credible. Notably, beyond Petitioner's testimony, the documentary evidence demonstrates that Respondent resided at times in the Czech Republic from 2012 through August 2014.   For example, Respondent made appearances at numerous monthly Prague municipality meetings. *See* P#51 (memorializing Respondent's attendance at meetings between November 2012 through October 2013).  It is illogical to envision that Respondent would travel routinely back and forth from the United States to the Czech Republic to attend such meetings, and even more, there is no evidence of record, beyond Respondent's testimony, to demonstrate such travel. Further, Petitioner and Respondent made numerous trips during the relevant time period, including trips to Australia, Portugal, Italy, Colorado, Florida, and the Bahamas, all travel which apparently originated from the Czech Republic.

Respondent residing in the Czech Republic at times from 2012 through September 2014 is what allowed her relationship with Petitioner to grow into a loving and committed relationship.  The seriousness and exclusivity of Petitioner and Respondent's relationship was signified by the engagement ring that Petitioner presented to Respondent in January 2014. Thus, it seems more plausible that Respondent was residing in the Czech Republic, as Petitioner claimed, in order for their relationship to evolve to Petitioner's eventual proposal.  Although it

is clear that Respondent was unsure about the institution of marriage, and more specifically about marrying Petitioner, it is also clear that Respondent accepted the engagement ring and proudly wore it.  *See* P#11 (compilation of photographs depicting Respondent wearing the engagement ring; most illuminating is the third photograph, which is a professional photograph of Petitioner and Respondent with a dog).  Shortly after Petitioner asked Respondent to marry him, they then purchased the Zbraslav home in April 2014.  *See* P#14.  The very timing of these significant events (the proposal and home purchase) is more reflective of Petitioner and Respondent's relationship evolving with a mutual intent to have a future together, as compared to Respondent's assertion that the ring was just a gift and the Zbraslav home was just an investment.

The nature of Petitioner and Respondent's relationship from 2012 through August 2014, provides valuable insight into Petitioner and Respondent's allegations as to what occurred from August 2014 through April 2016.  In August 2014, Petitioner and Respondent took a trip to the Bahamas, and Respondent claimed it was during this trip that she permanently ended her casual relationship with Petitioner.[18]  After the Bahamas trip, Respondent asserted that she went back to Miami and then, from there, traveled in September 2014 with her mother and a friend for a trip in Europe, which abruptly ended due to her mother's health concerns.  Respondent claimed that she intended to return to the United States after the trip, but that, since her mother decided to seek medical care in the Czech Republic, Respondent canceled her plans to return to the United States, which resulted in her indefinite stay in the Czech Republic.  *See* R#22 (canceling

---

[18] It must be noted that Respondent was apparently in the Czech Republic just prior to the August 2014 trip to the Bahamas, as reflected by Petitioner and Respondent's visit in the Czech Republic with Adam Krupp and his wife in July 2014, and the formation of Radio Palace Foundation in August 2014.  *See* P#53.

a February 9, 2015 trip from Prague to Denver).  Although Respondent asserted that she ended her relationship with Petitioner in August 2014, she stated that she sought comfort from Petitioner given her mother's uncertain health, which resulted in L.N.R.'s un-planned conception in October 2014.  Respondent detailed a series of events which she, in essence, described that she was stuck in the Czech Republic as a prisoner of circumstances beyond her control.  Specifically, Respondent asserted that, despite wanting to give birth to L.N.R. in the United States and to remain in the United States with L.N.R. after his birth, she was prevented from doing so by her mother's ovarian cancer and subsequent treatment, her inability to fly as a high-risk pregnancy, and L.N.R.'s diagnosis of hydrocele.  Respondent was resolute in her testimony that she ended her casual relationship with Petitioner in August 2014, and that they have never had any type of significant or committed relationship and never lived together before or after L.N.R's birth.  Respondent contended that Petitioner knew she always intended to return to the United States with L.N.R. as soon as she could, which she claimed was demonstrated by his knowledge that she wanted to give birth to L.N.R. in the United States and the Declaration of Intent signed by Petitioner.  Respondent further asserted that Petitioner specifically knew that she and L.N.R. were leaving the Czech Republic for the United States on April 20, 2016.

    In stark contrast, Petitioner asserted that he and Respondent did not break up in the Bahamas.  Petitioner claimed that, after that trip, he returned to the Czech Republic and Respondent went to Florida in advance of her planned trip to Europe with her mother and friend.  Petitioner acknowledged that, in September 2014, in the Czech Republic, he and Respondent had a fight, resulting in what he called a very short break up of approximately two weeks.  Petitioner added, however, that they were not broken up in October 2014, and, although unexpected, L.N.R.'s conception was welcomed.   Petitioner adamantly maintained that

Respondent resided with him at his Sevcikova apartment before L.N.R. was conceived, and then in April 2015 they moved, in anticipation of L.N.R.'s birth, into the Maltezske apartment because it was a larger apartment.  Petitioner stated, essentially, that, after L.N.R.'s birth in July 2015 through the holidays up to January 2016, Petitioner, Respondent, and L.N.R. lived as a family in the Maltezske apartment.  Petitioner acknowledged that during that time period it became apparent that Petitioner and Respondent had trust issues in their relationship, until it eventually deteriorated when he decided to permanently end their relationship in January 2016. Petitioner continued that, after the January 2016 break up, he and Respondent continued with a friendly relationship, and he would visit with L.N.R. approximately two or three times per week.  Petitioner noted that, as time went on, he became frustrated with his ability to schedule times with Respondent to see L.N.R., and then began asking Respondent for a more scheduled time-sharing of L.N.R., including overnight visits.  Petitioner claimed that the last time he saw L.N.R. in the Czech Republic was on April 10, 2016.  Petitioner stated, in no uncertain terms, that he absolutely had no knowledge that Respondent intended to take L.N.R. to the United States, and he first learned that Respondent and L.N.R. were in the United States from Ms. Young's letter (P#44).

Again, I find Petitioner's testimony entirely credible and Respondent's not credible because the documentary and other evidence, as noted above, fully corroborates Petitioner's statements and casts doubt upon Respondent's statements.  The fact that, on May 11, 2016, Petitioner canceled his cable subscription at his Sevcikova apartment, and then a few days later, on May 16, 2015, he opened up a cable subscription for the Maltezske apartment is highly persuasive that Petitioner and Respondent were cohabitating and were moving residences in anticipation of L.N.R's birth.  *See* P#16 & 17.  Petitioner and Respondent's cohabitation during

this time period is also suggested by Respondent purchasing, from June through December 2015, household items for himself, Respondent, and L.N.R.  *See* P#4 (identifying purchases made at Marko, a wholesale store, of which Petitioner was a member); *see also* P#57 (displaying a shopping list of items from Respondent to Petitioner); P#58 (invoicing a December 2015 purchase of a breast pump by Petitioner).  Further, Petitioner was present for L.N.R.'s birth and Respondent specifically wanted him there for the birth.  *See* P#69 & 78.  Petitioner attended some of L.N.R's doctor's appointments with Respondent, and Petitioner and Respondent took the necessary steps to ensure that L.N.R had Petitioner's last name.  *See* P#2.  All of these actions are more suggestive of an active and committed relationship, as described by Petitioner.  Notably, in November and December of 2015, Petitioner and Respondent made the initial payments for the construction work being done at the Zbraslav residence.  *See* P# 70 &71.  It seems likely that, if the Zbraslav residence was an investment property, as claimed by Respondent, then, to minimize expenditures and to maximize the return on the investment, Petitioner and Respondent would have initiated the construction work soon after they purchased the property in April 2014.  Rather, given the timing of the construction and the fact that L.N.R. was just born, it seems more plausible that the Petitioner and Respondent were beginning the renovations in November 2015 with the intent to move into the property with L.N.R.

Most probative are Petitioner's and Respondent's assertions regarding the circumstances surrounding L.N.R.'s first Christmas.  Respondent claimed that Petitioner was essentially unwelcomed at her cottage for Christmas with her family, but she invited him there for L.N.R's sake.  Notably, Respondent indicated that it was, in essence, an unpleasant experience for her and her family, as she claimed Petitioner was drunk and inappropriate.  In turn, Petitioner asserted that they planned to share the Christmas holiday with both his and

Respondent's families and that it was a good first Christmas with L.N.R.  Respondent's claims surrounding L.N.R.'s first Christmas are entirely inconsistent with the documentary evidence. As initial matter, the photographs taken at her cottage during Christmas dinner display a normal holiday environment, unlike the hostile and unpleasant environment, as she described.  *See* P#91 (containing several photographs of Petitioner, Respondent and L.N.R. with Respondent's family at the cottage).   More importantly, the text message communications between Respondent and Petitioner on December 22 and 23, 2015, provide an enlightening peek at Petitioner and Respondent's relationship during that time period.   In the text messages, Respondent repeatedly referred to Petitioner as "Honey" or "My Love," and would end some of the messages by saying, "I love you" or "we miss you here."  *See* P#100.   Respondent requested that Petitioner do some "things at home" before leaving for the cottage, including putting sheets in the dryer at the house, so he could bring them dry to the cottage; to bring L.N.R.'s spoon; and to bring a bag with gifts.  *Id.*  The terms of endearment that Respondent used to refer to Petitioner in the text messages are totally inapposite of her testimony.  Further, Respondent's request for Petitioner to do some "things at home" is a clear indication that Petitioner and Respondent were residing together as a family with L.N.R.  The familial bond that existed at the time is further symbolized by the Christmas gift Respondent gave Petitioner, which was the imprint of Respondent's hand print over Petitioner's hand print, and L.N.R.'s hand print over both his parent's hand prints.  *See* P#90.  Respondent also specifically asked Petitioner to print out the plans for Zbraslav residence and bring them with him to the cottage. *See* P#100.  Additionally, if Respondent's family was as put off by Petitioner's presence for the Christmas dinner, then it is illogical that Respondent's grandfather would send Petitioner a text message on December 28, 2015, wishing Petitioner a happy birthday.  *See* P#73.

Although Respondent claimed that she permanently ended her relationship with Petitioner in August 2014, I find that claim not plausible.  Rather, I find totally credible Petitioner's assertion that he ended the relationship in January 2016.  Petitioner's claim is established by Respondent's own words in her January 24, 2016 text message to Petitioner's mother, in which she stated: "[h]ello Jitka, I am very sad of it, you certainly know that Honza split up with me and it is very hard for me . . . ."  P#80.  Additionally, the fact that Petitioner calculated child support payments at the end of January 2016, and began making such payments from January to April 2016 (*see* P#21), is also highly suggestive that Petitioner and Respondent's relationship ended in January 2016.  The fact that Respondent first hired Mikesova as a babysitter in March 2016, also corroborates Petitioner's testimony that prior to January 2016 there was no need for a babysitter because his mother would often watch L.N.R. Most significant, are the text messages between Petitioner and Respondent from January 2016 until April 2016, during which Petitioner is routinely asking Respondent if he can meet with her to visit with L.N.R.  *See* P#23.  Certainly, the content of the text messages themselves is significant, but even more notable is the fact that, prior to January 18, 2016, there is no evidence of record in which Petitioner was routinely asking Respondent to visit with L.N.R.  The lack of such evidence creates a very strong inference that Petitioner was not requesting to visit with L.N.R. prior to January 18, 2016 because Petitioner, Respondent, and L.N.R. were all still living together as a family.  Also notable is the fact that it was in February 2016 that Petitioner sold his equal share of the Zbraslav residence to Respondent.  If the Zbraslav residence was an investment property, as Respondent claimed, then there is no plausible explanation as to why Petitioner had to sell Respondent his share of the home at that time.  It seems more plausible

that, given the end of the relationship in January 2016, it was a logical step for Petitioner and Respondent to divest themselves from joint ownership of the property.

Additionally, contrary to Respondent's assertion that Petitioner knew that she intended to take L.N.R. to the United States, and specifically knew that she was leaving with L.N.R. permanently in April 2016, I find that Petitioner had no such knowledge, and was completely surprised and disheartened to learn that Respondent left the Czech Republic with L.N.R.  The record is substantially lacking any communications that would indicate that Respondent had planned to leave the Czech Republic, as claimed, and that Petitioner knew about the planned departure for April 20, 2016.  Rather, in her presumably last communication with Petitioner's mother, on April 10, 2016, Respondent sent Petitioner's mother a text message stating: "[h]ello Jitka, thank you for offering me help, the whole week had been so chaotic-[L.N.R.] was weak due to flu so I could not plan much.  This week I am at the cottage at least till Wednesday (and if work allows, then till Sunday) so [L.N.R.] will enjoy mountain air (and Masenka).  He has recovered here already.  Have a nice Sunday, see you V."  P#80 at Bate # 1229.  It is incomprehensible that there was no discussion about the possibility of allowing Petitioner's mother to visit with L.N.R. one last time, if it was common knowledge that Respondent was leaving with L.N.R. for the United States in just ten days.  Certainly, it seems logical that, if Petitioner was aware of the planned departure, he would have attempted to set up a visit for him and his parents for a last visit with L.N.R. prior to the planned departure.

It is apparent that, when Petitioner drove to Respondent's cottage to see L.N.R. on April 10, 2016, he was completely unaware that would be the last time he would see L.N.R. in the Czech Republic.  Insightful to Petitioner's complete lack of knowledge about Respondent and L.N.R.'s eventual departure are Petitioner and Respondent's e-mail communications, beginning

on April 12, 2016.  Just days prior to the eventual departure, Respondent sent an e-mail to Petitioner stating, in sum, that, after discussing the matter during a phone conversation, she was shocked to learn that Petitioner had failed to file the appropriate paperwork to remove his right of first refusal from the Zbraslav residence, since it was agreed it would be terminated by her purchase of the residence.  *See* P#22.  Notably missing from this communication is any reference to an urgent need to resolve the issue before her impending departure for the United States.  On April 13, 2016 and April 14, 2016, Petitioner and Respondent shared e-mails in which both express displeasure with the other in trying to bring L.N.R into their problems.  *Id.* The final communication in this e-mail string occurred on April 15, 2016, in which Petitioner stated to Respondent that he wanted to make an agreement on when and where he could see L.N.R., including visitations over the holidays, and that, if they could not come to an agreement amongst themselves, he suggested using the services of a court-authorized mediator.  *Id.*  If Petitioner in fact knew that Respondent was planning to leave the Czech Republic in the next five days, as Respondent claimed, then such a communication regarding a time-share arrangement for L.N.R. in the Czech Republic is completely nonsensical.  Respondent suggested that this communication was sent by Petitioner likely as some sort of a setup, planning for this instant matter.  However, if Petitioner was aware of Respondent's impending departure and he was desirous to prevent Respondent from leaving with L.N.R., it seems more plausible that Petitioner would have just pursued an action with the court in the Czech Republic. Also, notably, Respondent never responded directly to Petitioner's time-share proposal.  The next communication was a text message in which Petitioner, on April 17, 2016, asked Respondent whether she was fulfilling a prior threat to him by not letting him see L.N.R  *See*

P#23.  Respondent responded to Petitioner by text message on April 18, 2016,[19] and stated, in sum, that she had been trying to call Petitioner; she questioned what the Petitioner was writing and what threat he was talking about; she noted that Petitioner didn't call during the week and now it was urgent; she further commented that she didn't understand his games; and that they agreed to something and that L.N.R.'s and her travel and life plans were not going to change according to Petitioner's mother; and she ended the message by asking "[d]o you want to see L.N.R. before departure."  *See* R#55.

Respondent specifically claimed that when Petitioner visited L.N.R. at her cottage on April 10, 2016, she advised Petitioner that she would be in London with L.N.R on April 20, 2016, prior to their ultimate departure to the United States, and she further claimed that, because Petitioner was scheduled to be in London for business, they agreed to meet in London so Petitioner could see L.N.R. one more time.   However, contrary to Respondent's claim, Petitioner had no plans to be in London on April 20, 2016.  Rather, on April 18, 2016, Petitioner flew to Liverpool, England and drove to Manchester, England to meet with a client in advance of a court appearance in Manchester on the following day.  *See* P#26 (court notice for hearing on April 19, 2016, in Manchester).  Subsequently, on April 20, 2016, Petitioner flew back to the Czech Republic.  Respondent suggested that her comment ending her April 18, 2016 text message asking Petitioner "[d]o you want to see L.N.R. before departure" (*see* R#55) was referring to whether Petitioner wanted to see L.N.R. before they departed for the United States, as discussed on April 10, 2016 at her cottage.  Respondent further suggested that her April 19,

---

[19] Curiously, on April 18, 2016, Respondent filed a lawsuit in the Czech Republic against Petitioner to quiet his right of first refusal on the Zbraslav residence (*see* P#75 (noting that Respondent was residing at Eversfield Court in the United Kingdom)), but Respondent made no mention of the suit to Petitioner.

2016 text message, in which she stated that she unsuccessfully attempted to call Petitioner nine times but that he hung up on her; and that the excitement of London was probably a big temptation to prevent Petitioner from saying goodbye to L.N.R. prior to their departure for the United States, is also a reference to Petitioner meeting with L.N.R. in London, as was planned on April 10, 2016 at her cottage.

I find Respondent's claim that she and Petitioner planned on April 10, 2016 to meet in London illogical because it is clear that Petitioner was never going to be in London, as Respondent claimed because he was scheduled for court in Manchester, England.  Further, it does not follow that Petitioner, from January through April 2016, made continued efforts to see L.N.R whenever possible, but then would simply decide not to show up to see L.N.R. in London, after allegedly planning to meet with his son one last time prior to his departure to the United States.  I find, as Petitioner asserted, Respondent's April 18, 2016 text message asking Petitioner "[d]o you want to see L.N.R. before departure" is a reference to Petitioner's departure to Manchester.  Additionally, I find that Respondent's April 19, 2016 text message not credible, as it is irreconcilable.  Respondent's text message suggests that she was attempting to call Petitioner on April 18, 2016 to meet up with him in London to say goodbye to L.N.R., and further suggests that the excitement of London was probably a distraction that prevented Petitioner from seeing L.N.R.  Respondent's claim regarding the text message is fatally flawed.  Since Respondent's mother did not purchase their plane tickets to travel to London until April 19, 2016, Respondent could not have been in England on April 18, 2016 to attempt to call and meet up with Petitioner in London.  Thus, I find that Petitioner was completely unaware of Respondent's plan to leave the Czech Republic and take L.N.R. to the United States. Petitioner's lack of knowledge regarding Respondent's planned departure with L.N.R. is further

demonstrated by his two April 21, 2016 e-mails in which he desperately asked Respondent to let him see L.N.R. and asked why she would not let him see L.N.R. *See* P#99. Interestingly, Respondent, rather than responding to Petitioner's e-mails, instead sought legal counsel from Ms. Young, who, in turn, contacted Petitioner the next day by e-mail, informing Petitioner that she represented Respondent and L.N.R., and that all further communication to Respondent regarding any issues should be directed to Ms. Young. *See* Dkt. No. 44. Soon after, on April 28, 2016, Respondent filed suit in Pinellas County to determine parental responsibility, time-sharing, and child support. *See* P# 6 & 93. If Petitioner had known that Respondent was leaving the Czech Republic with L.N.R., as Respondent claimed, then Respondent's reaction to immediately seek counsel and file suit without first contacting Petitioner to inquire about the content of his April 21, 2016 e-mails seems, at a minimum, irrational. Rather, I find that it is more likely that Respondent's reaction was predicated upon a concern about what legal measures Petitioner may have pursued upon learning of her departure with L.N.R. to the United States.

## II.  Legal Standard

The Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670,[20] to which the Czech Republic and the United States are signatories,[21] was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Id.* The rationale underlying the Hague Convention is that a child's

---

[20] The Convention was reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986).

[21] Although Petitioner offered no evidence to establish the Czech Republic as a signatory, Respondent has stated no opposition to the contrary, and the undersigned takes judicial notice that the Czech Republic is a signatory to the Hague Convention.

country of habitual residence is the place where decisions relating to custody and access are best decided. *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1340 (S.D. Fla. 2002). The United States implemented the Hague Convention through ICARA, 22 U.S.C. §§ 9001 et seq., which entitles a person whose child has been wrongfully removed to, or wrongfully retained in, the United States to petition a federal court to order the child returned. 22 U.S.C. § 9003(b). Courts considering an ICARA petition have jurisdiction to decide the merits only of the wrongful removal or retention claim, not of any underlying custody dispute. *Lops v. Lops,* 140 F.3d 927, 936 (11th Cir. 1998); *see also Friedrich v. Friedrich,* 78 F.3d 1060, 1063 (6th Cir. 1996). Simply stated, "[t]he Hague Convention was enacted to 'secure the prompt return of children wrongfully removed to or retained in any Contracting State.'" *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) (citations omitted). "The convention is intended as a rapid remedy for the left-behind parent to return the status quo before the wrongful removal or retention." *Id*. "The Court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." *Id*.; *see also* 22 U.S.C. § 9001(b)(4).[22]

The Petitioner bears the initial burden of proving by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention." *Ruiz,* 392 F.3d at 1251. To establish a case of wrongful removal or retention, Petitioner must establish by a preponderance of the evidence that: (1) L.N.R. was a "habitual resident" of the Czech Republic immediately before the removal by Respondent; (2) the removal was in breach of Petitioner's custody rights under the laws of the Czech Republic; (3) Petitioner had been

---

[22] "When a parent abducts a child and flees to another county, the Hague Convention on the Civil Aspects of International Child Abduction generally requires that country to return the child immediately if the other parent requests return within one year." *Lozano v. Montoya Alvarez,* 134 S. Ct. 1224, 1228 (2014). Here, Petitioner has timely asserted his request, given that the removal occurred in April 2016 and the Petition was originally filed on July 14, 2016.

actually exercising or would have been exercising custody rights concerning L.N.R. at the time of L.N.R.'s removal; and (4) L.N.R. has not attained the age of 16. *See Ruiz*, 392 F.3d at 1251; *Lops*, 140 F.3d at 936. If this burden is met, the child must be promptly returned, unless the Respondent can establish that one of the Hague Convention's enumerated defenses applies. *Lops,* 140 F.3d at 936-45.

There are four affirmative defenses under the Hague Convention, only two of which are asserted by Respondent here: (1) the person seeking return of the child consented to or later acquiesced in the removal or retention (*see* Hague Convention Art. 13a), and (2) there is a grave risk that the return of the child would expose it to physical or psychological harm (*See* Hague Convention Art. 13b). The affirmative defense relating to consent or acquiescence must be established by a preponderance of the evidence, while the affirmative defense pertaining to grave risk of physical or psychological harm must be shown by clear and convincing evidence. *Friedrich,* 78 F.3d at 1067. The affirmative defenses must be narrowly interpreted. *Id.*; *see also* 22 U.S.C. § 9001(a)(4).

Here, it is undisputed that Respondent removed L.N.R. from the Czech Republic to the United States. Further, Respondent does not contest (1) that the alleged removal would be a breach of Petitioner's custody rights under Czech Republic law,[23] (2) Respondent acknowledges that Petitioner was exercising his custodial rights at the time of the alleged removal, and (3) Respondent does not dispute the obvious, that L.N.R. is under the age of 16. Thus, the dispute is focused on Petitioner's ability to prove the first element - that L.N.R.'s habitual residence was the Czech Republic.

---

[23] Additionally, the undersigned, as requested by Petitioner (*see* Request for Judicial Notice, Dkt. No. 65), takes judicial notice of Petitioner's custody rights as provided under Czech Republic law, and finds the alleged removal and retention is a breach of those custodial rights.

The interpretation of habitual residence is vitally important to the Hague Convention because it will dictate the arbiter of the custody dispute.  However, neither the Hague Convention nor ICARA actually define the term habitual residence. *Ruiz,* 392 F.3d at 1252. The Eleventh Circuit, in *Ruiz,* set forth the analytical framework for determining habitual residence, however.  *Id.*  "The first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." *Ruiz*, 392 F.3d at 1252 (citing *Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir. 2001)).  "[W]hen an alleged abandonment of a clearly established habitual residence for a new home is at issue, the court must determine not only whether the child was settled in his new home, but whether the prior habitual residence was abandoned, and the new home has supplanted the old 'as the locus of the [child's] family and social development.'"  *Small v. Clark,* No. 5:06-CV-125-OC10GRJ, 2006 WL 2024955, at *4 (M.D. Fla. July 17, 2006) (quoting *Mozes,* 239 F.3d at 1084).  "It is not necessary to have this settled intention at the time of departure, as it could develop during the course of a stay originally intended to be temporary."  *Ruiz,* 392 F.3d at 1252 (citing *Mozes,* 239 F.3d at 1075).  The determination of this "subjective" settled intent is important "because there can be no bright line rule with respect to the length of an absence."  *Id.* at 1253.  "'All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.'"  *Id.* at 1252 (citations omitted).

Because a young child, such as L.N.R., does not have a "settled intent" independent of his parents, a court should look to "the settled purpose and shared intent of the child's parents in choosing a particular habitual residence."  *Whiting v. Krassner,* 391 F.3d 540, 550 (3d Cir. 2004); *see also Ruiz,* 392 F.3d at 1253.  Importantly, the emphasis is on the shared intentions of both parents rather than unilateral intentions of one parent.  *Samholt v. Samholt*, No.

1:06CV00407, 2006 WL 2128061, at *2 (M.D. N.C. 2006) (citing *Feder v. Evans-Feder,* 63 F.3d 217, 224 (3d Cir. 1995)). "Because the Convention tries to prevent one parent from unilaterally determining the country in which the child will live, the habitual residence of the child cannot be shifted without mutual agreement. Moreover, courts have generally refused to find that the changed intentions of one parent shifted the child's habitual residence." *In re Ahumada Cabrera,* 323 F. Supp. 2d 1303, 1311 (S.D. Fla. 2004) (citations omitted).[24]

In addition to the settled intention of the parents, for there to be a relocation of the habitual residence, "there must be an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized." *Ruiz,* 392 F.3d at 1253. However, such indicators of "acclimatization," such as doing well with school and friends, *see id.* at 1253-54, are not a significant factor when the child removed was younger than three years old. *See Yocom v. Yocom,* No. 6:05CV590ORL28DAB, 2005 WL 1863422, at *5 (M.D. Fla. Aug. 5, 2005) (stating that, in the case of a very young child, "acclimatization is not nearly as important as the settled purpose and shared intent of the child's parents in choosing a particular habitual residence") (citation omitted). Although the above case law does not squarely address the issues in this matter because the Court is not confronted with the acquiring of a new habitual residence, it is nonetheless informative in narrowing the focus to the parents' shared intent when confronted with an infant, such as L.N.R.

At least one court has noted that "[a]n infant may not actually acquire habitual residence if the infant's location at the time of litigation has nothing to do with establishing a new home and residence and the parties have no shared intent as to where, or if, they will live as a family."

---

[24] Notably, an infant's habitual residence does not automatically become that of his mother. *See Nunez-Escudero v. Tice-Menley,* 58 F.3d 374 (8th Cir.1995).

*Delvoye v. Lee*, 329 F.3d 330, 333-34 (3d Cir. 2003).   As the *Delvoye* court noted, one commentator has suggested:

> [A] newborn child born in the country where his . . . parents have their habitual residence could normally be regarded as habitually resident in that country. Where a child is born while his . . . mother is temporarily present in a country other than that of her habitual residence it does seem, however, that the child will normally have no habitual residence until living in a country on a footing of some stability.

*Id.* (citations omitted).   The *Delvoye* court further stated that:

> [t]he habitual residence of the child is where it last had a settled home which [is] in essence where the matrimonial home was . . . Where a matrimonial home exists, i.e., where *both parents share a settled intent to reside*, determining the habitual residence of an infant presents no particular problem, it simply calls for application of the analysis under the Convention with which courts have become familiar.  Where the parents' relationship has broken down . . . the character of the problem changes. Of course, the mere fact that conflict has developed between the parents does not *ipso facto* disestablish a child's habitual residence, once it has come into existence.    But where the conflict is contemporaneous with the birth of the child, no habitual residence may ever come into existence.

*Id.* (emphasis added).   The determination of "habitual residency" is a mixed question of fact and law.  *Ruiz,* 392 F.3d at 1251-52. In other words, the Court is faced with a fact-intensive inquiry, which culminates in a legal determination of habitual residency.[25]

---

[25] "In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law." *Small,* 2006 WL 2024955, at *3 (citing *Childrey v. Bennett,* 997 F.2d 830, 834 (11th Cir. 1993)).

### III.  Analysis[26]

To determine whether L.N.R. was wrongfully removed within the meaning of the Hague Convention, the core question before the Court is whether L.N.R. was a habitual resident of the Czech Republic.  In order to decide whether L.N.R. was a habitual resident of the Czech Republic, given L.N.R.'s young age, the Court must examine the shared intent, if any, of Petitioner and Respondent, and, to do so, the Court must evaluate the totality of the circumstances relating to the nature of their relationship to determine if such a shared intent existed.

#### A.  __Petitioner's case is established by a preponderance of the evidence__

As noted in the above factual findings, Petitioner and Respondent presented divergent cases regarding the nature of their relationship after L.N.R.'s birth up to April 2016. Essentially, Petitioner portrayed a case that he and Respondent established a settled intent to live as a family with L.N.R up to their break up in January 2016, while Respondent presented a case in that she had no relationship with Petitioner, that conflict between them was contemporaneous with L.N.R.'s birth, and that she had established no settled intent with Petitioner that L.N.R. would reside in the Czech Republic.  The record does demonstrate that Respondent clearly desired to give birth to L.N.R. in Miami, Florida, as reflected by her pre-registration form for the Miami hospital (R#24), and her May 1, 2015 letter to her tenants at the Redington Beach house informing them when they would need to leave the residence so she could "arrive from Europe and give birth to my baby."  R#26.[27]  Further, it is without question

---

[26] To the extent that any of the following conclusions of law represent findings of fact, the Court adopts them as such.

[27] *See also* R#46 at 2 (statement by Petitioner's parents that Respondent wanted to give birth in the United States)

that Respondent wanted L.N.R. to have dual citizenship in the Czech Republic and the United States.  Dual citizenship for L.N.R. was of such high importance to Respondent that she had Petitioner execute the Declaration of Intent, which stated:

> I, Jan Rath . . . , believe it is in the best interest of my son [L.N.R.] . . . to be a citizen of the United States, to grow up experiencing American culture and knowing the English language.
>
> I hereby certify this document is intended as a formal declaration of my belief in the above and my intent to do all that is in my power to facilitate the above and not hinder in any way what is in the best interest of my son.

P#92 and R#39.  Soon after executing the Declaration of Intent, Petitioner and Respondent went to the United States Embassy to obtain a Consular Report of Birth Abroad, *see* R#40, and a United States Passport for L.N.R.  *See* R#41.  Respondent asserted that the fact that she wanted to give birth in Miami and that Petitioner executed the Declaration of Intent are demonstrative of Petitioner's knowledge that Respondent always intended to leave the Czech Republic and live with L.N.R in the United States.  Respondent claimed that her mother's cancer treatment and her inability to fly as a high-risk pregnancy prevented her from leaving the Czech Republic during her pregnancy.  Further, Respondent claimed that, after L.N.R.'s birth, her stay in the Czech Republic was prolonged by L.N.R.'s hydrocele diagnosis.   Namely, Respondent suggested that, although L.N.R. was born in the Czech Republic, she and L.N.R. were merely there temporarily based upon circumstances beyond her control.  *See Delvoye*, 329 F.3d at 333 (stating "[w]here a child is born while his . . . mother is temporarily present in a country other than that of her habitual residence it does seem, however, that the child will normally have no habitual residence until living in a country on a footing of some stability.")

Notably, neither party offered any medical definition of a hydrocele, nor any evidence on why hydrocele would prevent Respondent from traveling with L.N.R.  According to the

Mayo Clinic "[a] hydrocele is a fluid-filled sac surrounding a testicle that causes swelling in the scrotum. Hydrocele is common in newborns and usually disappears without treatment during the first year of life. Older boys and adult men can develop a hydrocele due to inflammation or injury within the scrotum.  A hydrocele usually isn't painful or harmful and might not need any treatment."[28]  Given this definition of hydrocele, it would be difficult to understand why Respondent would have been prevented from leaving the Czech Republic. Regardless of a definition of hydrocele, the evidence of record casts serious doubt upon Respondent's claim that she could not travel with L.N.R. because of his hydrocele.  As noted above, Respondent introduced a hearsay statement of her doctor noting that the doctor advised against Respondent traveling during her pregnancy in May 2015 (*see* R#29), but Respondent did not provide any similar hearsay statement from L.N.R's pediatrician to support her claim that the pediatrician advised her not to travel with L.N.R. because of the hydrocele.  Further, L.N.R's pediatrician makes no reference of any kind in the medical records about advising Respondent that L.N.R. could not fly because of the hydrocele.  And, more significantly, L.N.R.'s last doctor's appointment in the Czech Republic was January 22, 2016, in which the medical record reflected hydrocele again, but further noted that "surgery: the finding is about to reduce . . . ."  R#33.  Although there is a reference that "the finding is *about* to reduce," the January 22 report does not finalize any issues surrounding the hydrocele.  *Id.* (emphasis added).  If the hydrocele was preventing L.N.R. from traveling, then it is only logical that sometime between January 22, 2016 and April 20, 2016, Respondent would have taken L.N.R. in for

---

[28] *See* http://www.mayoclinic.org/diseases-conditions/hydrocele/basics/definition/con-20024139

another doctor's appointment to confirm that the hydrocele was no longer an issue preventing L.N.R.'s travel.[29]

Additionally, the timing of the Declaration of Intent is significant because the need for the document is likely a sign that by September 2015 there was some distrust creeping into Petitioner and Respondent's relationship. Even more, the timing is compelling because it was drafted just before Petitioner and Respondent went to obtain L.N.R.'s United States citizenship, which then demonstrates that the Declaration of Intent was likely done to ensure L.N.R.'s United States citizenship. Since Respondent could not have known about the alleged delay of travel caused by L.N.R's hydrocele, if the Declaration of Intent was drafted to memorialize an understanding that Respondent was only in the Czech Republic temporarily, it certainly would have made more sense for the document to be executed prior to L.N.R.'s birth or immediately thereafter. Further, since the Declaration of Intent does not state in any way that Respondent intended to live in the United States with L.N.R., it seems unfounded to interpret it beyond the plain reading of the document, especially in consideration of the fact that both Respondent and Petitioner are lawyers.

Given the above factual and credibility findings, I find that Respondent's expressed desire to give birth to L.N.R. in the United States, and later pursuit of United States citizenship for L.N.R., are only reflective of Respondent's desire for L.N.R. to have dual citizenship, like her, so that L.N.R. would be able to avail himself in the future of the benefits that result from the dual citizenship. Conversely, I do not find that Respondent's desire to give birth in Miami

---

[29] Interestingly, Petitioner entered into the record a hearsay statement by L.N.R.'s pediatrician indicating that L.N.R. had a regularly scheduled appointment for April 21, 2016. *See* P#19 at 389.

and the Declaration of Intent demonstrate an intent by Respondent to reside in the United States with L.N.R.  Thus, after careful consideration of the evidence and testimony of record, I find that after L.N.R.'s birth, Petitioner, Respondent, and L.N.R. resided together as a family, and, more significantly, Petitioner and Respondent had, at that time, a mutual settled intent to reside as a family in the Czech Republic.[30]  I recognize that Petitioner and Respondent were not married, and that, from L.N.R.'s birth in July 2015 to the eventual end of their relationship in January 2016, there were signs that Petitioner and Respondent's relationship was deteriorating;[31] however, I am satisfied that Petitioner demonstrated, by a preponderance of the evidence, that at least up to L.N.R.'s first Christmas in 2015, Petitioner and Respondent had a mutual settled intent to reside as a family with L.N.R. in the Czech Republic.  *See Delvoye*, 329 F.3d at 333 (stating "the mere fact that conflict has developed between the parents does not *ipso facto* disestablish a child's habitual residence, once it has come into existence").  Thus, I conclude that L.N.R.'s habitual residence is in the Czech Republic, and that Petitioner has thereby established by a preponderance of the evidence that L.N.R. was wrongfully removed within the meaning of the Hague Convention.

### B.  <u>Respondent cannot establish affirmative defense of consent</u>

Given the finding that L.N.R. was wrongfully removed, L.N.R. must therefore be promptly returned to the Czech Republic, unless Respondent can establish that (1) Petitioner

---

[30] *See e.g.* P#7 (displaying various photographs of Petitioner, Respondent, and L.N.R. together in some intimate and happy moments).

[31] *See e.g.* R#46 at 2 (noting that Petitioner and Respondent had arguments over the Zbraslav residence and Respondent was staying with her grandparents when Petitioner and Respondent were fighting), and P#65 at Exhibit 4 (withdrawing the gift deed drafted that was drafted by Petitioner during a fight over the Zbraslav residence).

consented to the removal of L.N.R. (*see* Hague Convention Art. 13a), or (2) there is a grave

risk that the return of the L.N.R. would expose L.N.R. to physical or psychological harm (*see*

Hague Convention Art. 13b).  *See Lops,* 140 F.3d at 936-45.  As for the affirmative defense of

consent, Respondent essentially asserted that Petitioner accepted that Respondent and L.N.R.

would be residing permanently in the United States and took affirmative measures to facilitate

Respondent's and L.N.R.'s eventual move to the United States.  Respondent suggested that

Petitioner's consent was established by the Declaration of Intent (R#39; P#92) executed by

Petitioner; Petitioner and Respondent jointly obtaining a United States passport for L.N.R. at

the United States Embassy (R#41); and Petitioner and Respondent jointly executing an

immunization waiver form (R#42).  Given the above findings, Respondent cannot establish by

a preponderance of the evidence that Petitioner consented to her and L.N.R. leaving the Czech

Republic for the United States.  The Court is satisfied that Respondent's desire to give birth to

L.N.R. in the United States, the pursuit of United States citizenship for L.N.R., and the choice

to have L.N.R. later immunized[32] in the United States, all represent exactly what is stated in the

Declaration of Intent, that Petitioner and Respondent intended to for L.N.R. "to be a citizen of

the United States, to grow up experiencing American culture and knowing the English

language."  (R#39; P#92).  There is no doubt that Petitioner wanted L.N.R. to obtain dual

citizenship, so that L.N.R., like Respondent, would be able to avail himself in the future of the

benefits that flow from such dual citizenship.  But, Petitioner's desire for his son to have dual

citizenship does not equate to a finding that he consented to his son leaving the Czech Republic

to reside in the United States.  The lack of consent by Petitioner is demonstrated by the above

---

[32] No records were offered into evidence to establish that L.N.R. has been vaccinated in the United States.

findings that Petitioner was completely unaware about Respondent's April 2016 plans to leave the Czech Republic with L.N.R. to the United States. Given Petitioner's persistent efforts to schedule visitations with L.N.R. after Petitioner and Respondent broke up in January 2016, it is unreasonable to conclude that Petitioner would have consented to L.N.R.'s removal, as Respondent claims, without any time-sharing agreement or any future plans for visitations with L.N.R. Given this record, I find that Respondent failed to establish that Petitioner consented to L.N.R.'s removal.

### C. <u>Respondent cannot establish affirmative defense of grave risk of harm</u>

As for the affirmative defense pertaining to grave risk of physical or psychological harm, Respondent alleged that Petitioner assaulted her physically on multiple occasions, specifically including an occasion when Petitioner kicked Respondent in the stomach while she was pregnant, and another occasion when Petitioner pushed Respondent's face into the floor at her grandfather's home. Petitioner's mother and grandfather echoed Respondent's allegations of physical abuse. Malkova specifically testified that she witnessed, on occasions, Petitioner physically harm her daughter. Respondent's grandfather stated that, when he witnessed Petitioner attack his granddaughter at his house, he was so shocked that the only thing he thought to do was take a photograph of the attack.[33] Petitioner unequivocally denied Respondent's allegations of abuse. Absent the conflicting testimony regarding these allegations, there is little other evidence to support Respondent's allegations. Respondent had

---

[33] Respondent failed to offer into evidence R#45, but later filed a Motion to Admit Additional Exhibit (Dkt. No. 71). The Court denied Respondent's request to admit R#45 because neither Respondent nor her grandfather identified the photograph or were subject to cross-examination regarding the photograph. However, the Court accepted the photograph as Court Ex. # 2, given that the photograph was identified by Petitioner and displayed to the Court during the evidentiary hearing.

a gynecological examination on December 15, 2014 at 11:27 A.M.  *See* R#23.  The medical record noted that Respondent requested the examination because "today at 4 o'clock in the morning, she got hit in the abdominal region."  *Id.*  Respondent testified that she went for the exam because Petitioner got angry with her and kicked her in the stomach, while in contrast, Petitioner asserted that, while he and Respondent were sleeping together, he inadvertently hit her in the stomach with his elbow.  Also, Respondent suggested that Court Ex. #2 is the photograph that her grandfather took when Petitioner attacked Respondent at her grandfather's home.  *See* Dkt. No. 71.  Initially, it must be reiterated that neither Respondent nor Respondent's grandfather identified the photograph in Court Ex. #2 during the evidentiary hearing.  However, even assuming that the photograph was identified by Respondent or her grandfather, it is difficult to discern from the photograph alone whether it is depicting an act of violence, as Respondent alleged, or an act of playfulness, as Petitioner claimed.  More significant is the fact that nothing was done with the photograph.  Respondent's grandfather essentially testified that he took the photograph to document the alleged attack, but yet acknowledged that no report of the alleged abuse was ever filed with the authorities.  In fact, despite the allegations of multiple acts of physical abuse, there was never any report filed with any law enforcement agency.  In light of the above credibility findings, and the clear contradictory testimony regarding the allegations of physical abuse, the Respondent cannot establish by clear and convincing evidence that returning L.N.R. to the Czech Republic would subject L.N.R. to grave risk of physical or psychological harm.[34]  *Friedrich,* 78 F.3d at 1067.

---

[34] Respondent also testified that Petitioner had issues with alcohol abuse.  Although Petitioner admitted that previously he had been convicted for driving while intoxicated, the Court finds that Respondent failed to establish by clear and convincing evidence that Petitioner was abusing alcohol in any way that would cause grave risk of physical or psychological harm to L.N.R.

### D.  **Respondent's oral request for dismissal is without merit**

Upon conclusion of Petitioner's case, and renewed upon the conclusion of the evidentiary hearing, Respondent orally requested that the Court dismiss Petitioner's Petition (Dkt. No. 14) with prejudice based upon allegedly fraudulent and deceptive litigation tactics. Respondent highlighted three separate events in support of her dismissal request: (1) a translation of a Czech Republic court decision (*see* Dkt. No. 14, Ex. B); (2) Petitioner's testimony regarding receipts reflecting purchases of child products (*see* P#37 (composite exhibit of receipts)); and (3) the Petitioner's failure to produce in discovery an entire text message from April 19, 2016, and a complete text message from April 18, 2016 (*see* R#55). Invoking both the Court's inherent power and Federal Rule of Civil Procedure 37(b)(2), Respondent relied upon, amongst other cases, two Eleventh Circuit cases, *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1447 (11th Cir.1985) (stating that "deeply rooted in the common law tradition is the power of any court to 'manage its affairs [which] necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it'"); and *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993) (noting that a Rule 37 sanction of a default judgment requires a willful or bad-faith failure to obey a discovery order).  In order for Respondent's request to have merit, there must be a finding that Petitioner acted in bad faith.  *See Malautea*, 987 F.2d at 1542.  Here, Respondent's arguments of bad faith are substantially lacking.

Respondent complained that the English translation of the Czech Republic court decision attached to the Petition (Dkt. No. 14, Ex. B) was deceptive because the translation contained the below Czech Republic court seal and a signature.

Za správnost vyhotovení:
Martina Krejsová



Sean Mark Miller, the translator of the Czech Republic court decision, explained that he imaged the seal and signature from the original court decision, and placed them into the English translation, just as the Court has placed the seal and signature above in this Report and Recommendation. Initially, it is understandable that the use of the seal and signature on the English translation of the Czech Republic court decision could cause some confusion, but the fact that the original Czech Republic court decision was included with the English translation as an exhibit to the Petition clearly should have extinguished any such confusion. Further, Mr. Miller testified that Petitioner did not direct him on how to translate the decision and that he alone decided to embed the signature and seal into the English translation of the Czech Republic court decision. Additionally, Petitioner abandoned any claim related to the Czech Republic court decision. Thus, such conduct is certainly not bad faith. *See Malautea*, 987 F.2d at 1542 (stating that "[v]iolation of a discovery order caused by simple negligence, [or] misunderstanding . . . will not justify a Rule 37 . . . dismissal).

Next, Respondent argued that Petitioner's testimony misrepresented expenses he claimed that he or his family had incurred on behalf of L.N.R. Petitioner, during his testimony identified P#37, as receipts he gathered during the discovery process because he believed they reflected purchases made by himself or his parents for toys or necessities for L.N.R. However, upon cross-examination, when confronted with the recommended ages for use of some of the

products, Petitioner acknowledged that the items reflected in the receipts could have been items purchased by his parents for his niece.  Respondent claimed that Petitioner intentionally sought to deceive the Court regarding the nature of the receipts.  Petitioner could have testified that, although the recommended ages for the use of the products was for children much older than L.N.R, that Petitioner's parents nonetheless still purchased the products for L.N.R.   Instead, during cross-examination, Petitioner acknowledged that it was likely that a number of the receipts in R#37 were for items purchased by his parents for his niece, instead of L.N.R. Petitioner's acknowledgment regarding the receipts is not bad faith, rather it is the product of the very purpose of cross-examination, *i.e.*, to test the credibility and reliability of evidence. Based upon Petitioner's testimony during cross-examination about the receipts in P#37, the Court gives no weight to any of the receipts in P#37.  However, the Court's finding regarding the weight afforded to the receipts does mean that Petitioner acted in bad faith.  As Petitioner described, he produced the receipts because they reflected the purchase of child products. Certainly, Petitioner could have taken more time to verify with his parents the items purchased in the receipts prior to relying upon them in his case, but, given the very short discovery period in this matter, such neglect is excusable.  Thus, I am satisfied that Petitioner's testimony regarding the receipts in P#37 is, at worst, simple negligence, and falls well short of bad faith. *See Malautea*, 987 F.2d at 1542 (stating that "[v]iolation of a discovery order caused by simple negligence, [or] misunderstanding . . . will not justify a Rule 37 . . . dismissal).

Last, Respondent argued that Petitioner intentionally and in bad faith failed to produce in discovery an entire text message from April 19, 2016, and a complete text message from April 18, 2016 (*see* R#55).  As noted above, Respondent sent Petitioner a text message on April 18, 2016, and stated, in sum, that she had been trying to call Petitioner; she questioned what the

Petitioner was writing and what threat he was talking about; she noted that Petitioner didn't call during the week and now quickly-quickly before the departure; she further commented that she didn't understand his games and that they agreed to something and that L.N.R.'s and her travel and life plans are not going to change according to Petitioner's mom; and she ended the message by asking "[d]o you want to see L.N.R. before departure." *See* R#55.  The last sentence of the text message, "[d]o you want to see L.N.R. before departure," was missing from the text submitted by Petitioner in P#23. *See* P#23 at 000226, *compared with* R#55.  When questioned about why the last sentence was missing, Petitioner testified that he did not include the last sentence because he did not think it was relevant.  However, Petitioner's counsel later explained that Petitioner produced to counsel the entire April 18, 2016 text message.  However, given that the text message was in the Czech language, counsel failed to recognize that the last sentence of the April 18, 2016 text message continued onto another page, and thus inadvertently failed to include the entire text message as part of Petitioner's documents produced during discovery. In other words, although Petitioner produced the entire April 18, 2016 text to his attorneys, Petitioner's attorneys mistakenly failed to produce the text in its entirety to Respondent.  Given the language barrier and the short discovery period in this matter, such a mistake is understandable, and thus not bad faith.  The April 19, 2016 text message was a message sent by Respondent to Petitioner stating, in essence, that, on April 18, 2016, she unsuccessfully attempted to call Petitioner nine times but that he hung up on her; that the excitement of London was probably a big temptation to prevent Petitioner from saying goodbye to L.N.R. prior to departure; that Petitioner knew of her life situation and that the relationship with his family would be distant; that she is tired of packing and traveling with L.N.R.; and that she does not want to argue over text messages.  *See* R#55.  Petitioner did not produce this text message in

discovery, and testified that he failed to do so because he was confused by the text message and did not find it relevant.  Although, as explained above, the Court gives no weight to this text message, it certainly should have been produced by Petitioner in discovery.  However, Respondent never complained about an incomplete production of discovery in this case, even though Respondent was aware that the April 19, 2016 text message was not produced.  Rather, Respondent waited until cross-examination to raise the issue.  If Respondent complained about an incomplete production of text messages during discovery, the Court would have given Petitioner an opportunity to address Respondent's complaint and cure the deficient production. Respondent suffered no prejudice from Petitioner's failure to produce the April 19, 2016 text message because Respondent, as the author of the text message, already had a copy of the text message in her possession.  Given this record, the Court does not need to determine whether Petitioner's failure to produce the April 19, 2016 text message was in bad faith.  Rather, Respondent's requested sanction of dismissal of Petitioner's Petition is simply unwarranted, given that Respondent possessed the April 19, 2016 text message and waited until cross-examination to raise the issue.  *See Malautea*, 987 F.2d at 1542 (stating that "the severe sanction of a dismissal . . . is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders").

## IV.  Conclusion

Accordingly, after due consideration and for the foregoing reasons, it is hereby **RECOMMENDED** that:

(1) Petitioner's Amended Petition to Recognize Foreign Judgment and Order Compliance and Return of Child (Dkt. No. 14) and Emergency Motion to Return

47

Child to Home Jurisdiction (Dkt. No. 3) be **GRANTED** to the extent that Respondent be directed to return L.N.R. to the Czech Republic without haste;

(2) Respondent's oral request for a sanction of dismissal of the Petition be **DENIED**; and

(3) Petitioner be awarded the fees, costs, and expenses reasonably associated with his Petition.

**IT IS SO REPORTED** in Tampa, Florida, this 3rd day of October, 2016.

ANTHONY E. PORCELLI
United States Magistrate Judge

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:

Hon. Steven D. Merryday
Counsel of Record